**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10 CR 1038 |
| ) | |
| IAAD HAMAD, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On December 9, 2010, the government filed a one-count indictment against Defendant Iaad Hamad ("Hamad") charging Hamad with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (R. 2, Indictment.) On October 9, 2013, Hamad filed a motion to quash his arrest and suppress the firearm and ammunition that Chicago Police Department ("CPD") officers seized at his store on October 15, 2010[1]. For the following reasons, the Court denies Hamad's motion to quash and suppress.

## BACKGROUND

On October 15, 2010, inspectors from the Cook County Department of Revenue ("Department of Revenue") conducted an inspection of H & Y Chicago Foods ("H & Y"), a store that Hamad owned, located at 3825 West Chicago Avenue, Chicago, Illinois. The Department of Revenue had a list of prior violators who had sold unstamped cigarettes and H & Y was on that list. Courtney Marshall ("Marshall"), an intern with the Department of Revenue,

---
[1] In November 2012, Hamad filed a motion to suppress statements he made to CPD officers on October 15, 2010. The Court conducted a suppression hearing on January 11, 2013 and denied that motion on January 30, 2013. (R. 45, Opinion and Order.)

initially entered the store in an undercover capacity and purchased a package of Newport cigarettes for $6 rather than the typical $8 or $9. He left the store and presented the package of cigarettes to Jessa Srain and Aaron Glasper, two Department of Revenue agents who noticed that the package did not have the required Cook County tax stamp. The three inspectors re-entered the store and Agent Srain identified herself to Alma Price ("Price") and Shanta Price, two store employees who were behind the counter. The Department of Revenue inspectors then went behind the counter to look for additional packages of cigarettes that did not contain the requisite county tax stamp.

During this inspection behind the counter of the store, Agent Srain found an additional unstamped package of cigarettes next to the cash register. In her search for additional cigarettes not bearing the requisite county tax stamp, Agent Srain discovered on the floor behind the counter a plastic bag that contained a large clear jar of white pills and multiple prescription pill bottles. In total, the agents discovered approximately 1500 Hydrocodone pills. While searching behind the counter, Marshall discovered a false floor compartment that held a shoe box containing two loaded ammunition magazines for a 9 mm handgun. Finally, while searching for unstamped cigarettes behind the door to the counter area, Agent Srain found a handgun in a velvet bag underneath a pile of t-shirts. Agent Srain contacted her supervisor who told her to call the CPD.

Agent Srain called the CPD to inform them that she had discovered a gun in her search. At some point later, CPD officers Alejandro Gallegos and Marco Bruno arrived at H & Y and Agent Srain directed them to the locations of the gun and the prescription pills. Hamad was not at H & Y when they arrived. Officer Gallegos encountered Price who told him that she was the manager of the store and that Hamad was the owner of the store. After Price identified herself as

the manager of the store, Officer Gallegos read Price her *Miranda* rights and told her that he was taking her into custody because of the prescription pills and the handgun. Price told Officer Gallegos that she believed the pills were candy and that Hamad told her to sell them for $5 dollars apiece. Price also stated that the handgun and the pills belonged to Hamad, and that Hamad told her she could use the handgun for protection. The CPD officers arrested Price and transported her to the 11th district police station at 3151 West Harrison Street. Later that day, Hamad arrived at the 11th district police station, provided his identification, identified himself as the owner of H & Y, and stated that he owned the handgun that Officer Gallegos had seized from the store. Officer Gallegos then arrested Hamad.[2]

## LEGAL STANDARD

"The Fourth Amendment protects citizens against unreasonable searches and seizures." *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013). "The jurisprudence of the Supreme Court makes clear that the primary bulwark against such conduct is the procurement of a warrant from a neutral and detached magistrate." *United States v. Whitaker*, 546 F.3d 902, 906 (7th Cir. 2008) (citing *Groh v Ramirez*, 540 U.S. 551, 575, 124 S. Ct. 1284, 157 L. Ed 2d 1068 (2004)). Accordingly, "[a] warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)). If law enforcement officials conduct a warrantless search, "the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *Id*. (citing *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)).

---

[2] The subject of Hamad's previous motion to suppress was his alleged statement to Officer Gallegos in which he admitted to owning the handgun recovered at H & Y Foods.

"A warrantless arrest satisfies the Fourth Amendment if supported by probable cause that the arrested individual committed a crime." *United States v. Freeman*, 691 F.3d 893, 898 (7th Cir. 2012). *See also United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009). As the Seventh Circuit has observed, "it does not take much to establish probable cause." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). "Probable cause exists when officers have a reasonable ground for belief of guilt." *Freeman*, 691 F.3d at 898 (quotations and citations omitted). Arresting law enforcement agents "must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox*, 600 F.3d at 833. "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (citation omitted); *see also Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979); *Beck v. Ohio,* 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)).

Probable cause to arrest is a "practical, common-sense decision," *Burnside*, 588 F.3d at 517 (citation omitted), that "requires probability, not absolute certainty, that contraband or evidence of a crime will be found." *Zahursky*, 580 F.3d at 521 (citation omitted); *see also Abbott*, 705 F.3d at 714 ("probable cause deals not with hard certainties but with probabilities." (citing *Illinois v. Gates*, 462 U.S. 213, 231, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983))). "In determining whether there is probable cause to search, law enforcement officers may draw reasonable inferences from the facts based on their training and experience." *Zahursky*, 580 F.3d at 521 (citation omitted). "The officer's belief that the arrestee was committing a crime need

only be reasonable." *Abbott*, 705 F.3d at 714 (citing *Henry v. United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959)). Determining whether an officer had probable cause to arrest is a purely objective inquiry. *Id*.

## ANALYSIS

Hamad argues that the Department of Revenue agents did not have any authority to search H & Y on October 15, 2010 and that the Court should suppress the firearm and ammunition the CPD recovered as a result of the Department of Revenue agents' search. Hamad further argues that the arresting officers had no credible basis to find that the firearm belonged to Mr. Hamad or that Mr. Hamad's illegally possessed the firearm. The parties do not dispute that neither the Department agents nor the CPD officers obtained a warrant before searching the premises of H & Y. Hamad also does not dispute that he owned the items recovered by the CPD. In fact, Hamad does not challenge any factual issues on which the government relies. Further, a comparison of Hamad's and the government's "factual backgrounds" reveals no material factual disputes or discrepancies. Hamad's only arguments are legal – whether the Department of Revenue agents had the authority to conduct a warrantless search of Hamad's store, whether the CPD could seize the handgun discovered at the store, and whether the CPD could arrest Hamad based on the evidence it discovered at H & Y.

**I.   Warrantless Administrative Search**

Although the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises as well as to private homes, "the expectation of privacy in commercial premises is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987) (internal citations omitted). This expectation of privacy "is particularly attenuated in

5

commercial property employed in 'closely regulated' industries." *Id*. Because of this reduced expectation of privacy, the warrant and probable cause requirements have less application in the context of searches of closely regulated industries. *Id*. at 702. Thus, the Supreme Court has established that where "the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id*.

Under *Burger*, a warrantless inspection is reasonable if it is conducted pursuant to a regulatory scheme or statute. A warrantless search pursuant to a regulatory scheme is reasonable if three conditions are met: first, there is a substantial government interest that informs the regulatory scheme; second, the warrantless inspection is necessary to further the scheme; and third, the statute's inspection program provides a constitutionally adequate substitute for a warrant. *Id*. at 702-703; *United Taxidermists Assoc. v. Ill. Dept. of Natural Resources*, 436 Fed. Appx. 692, 694 (7th Cir. 2011) (unpublished); *Contreras v. City of Chicago*, 119 F.3d 1286, 1290 (7th Cir. 1997).

Hamad does not contest any particular prong of the *Burger* standard in his challenge to the Department of Revenue's authority to inspect his store. In fact, Hamad does not even address the statute at issue in this case. The government identifies the Cook County Tobacco Tax Ordinance ("Ordinance") as the governing statutory scheme. The Ordinance establishes that it is a violation subject to penalty to sell, possess, or use any tobacco products upon which the tax has not been paid or the tax stamp has not been affixed. Ordinance, § 74-435. The relevant section of that Ordinance provides:

> Books and records kept in compliance with Section 74-439 of this article shall be made available to the Department upon request for inspection, audit and/or copying during regular business hours. Representatives of the Department shall

6

>be permitted to inspect or audit cigarette inventory in or upon any premises. An
>audit or inspection may include the physical examination of the cigarettes,
>packaging or the cigarette tax stamps. It shall be unlawful for any person to
>prevent, or hinder a duly authorized Department representative from performing
>the enforcement duties provided in this article.

*Id.*, § 74-440. Under the ordinance, "premises" means "but is not limited to, buildings, vehicles or any place where cigarette inventory is possessed, stored or sold." *Id*., § 74-431.

Hamad argues that for the government to rely on the sale of cigarettes without an affixed Cook County tax stamp as authority to search a place of business is "blatantly sophomoric – and rather bizarre." (R. 66, Reply at 3.) As a small grocery store that engaged in the retail sale of cigarettes, however, the Ordinance applied to H & Y. Pursuant to the *Burger* standard, the Department of Revenue's search of H & Y under the Ordinance was reasonable.

First, the County has a substantial interest in regulating the tobacco industry. *See Austin v. Tennessee*, 179 U.S. 343, 348-49, 21 S. Ct. 132, 45 L.Ed. 224 (1900) (finding that the state had a legitimate interest in regulating the sale of tobacco); *Townsend v. Yeomans*, 301 U.S. 441, 57 S. Ct. 842, 81 L. Ed. 1210 (1937) (upholding a state statute regulating fees charged by tobacco warehousemen for selling and handling farmers' tobacco and finding "such regulation goes back to an early day"). Given that there is a federal Bureau of Alcohol, Tobacco, Firearms and Explosives whose stated mission includes as a goal to "reduce alcohol smuggling and contraband cigarette trafficking activity … and significantly reduce tax revenue losses to the States," there is no doubt that the County has a substantial interest in regulating the tobacco industry. http://www.atf.gov/content/alcohol-and-tobacco (last visited December 17, 2013). Second, warrantless inspections pursuant to § 74-440 are necessary to further the regulatory scheme. *United Taxidermists*, 436 Fed. Appx. at 695 ("abundant case law extols the necessity of surprise in these searches") (citing *Burger*, 482 U.S. at 710; *United States v. Gonsalves* 435 F. 3d 64, 68

7

(1st Cir. 2006); *Lesser v. Espy*, 34 F.3d 1301, 1308 (7th Cir. 1994)). Third, the inspection program provides a constitutionally adequate substitute for a warrant. The statute informs a retail seller of tobacco products that it shall permit representatives of the Department of Revenue to inspect or audit cigarette inventory on its premises. § 74-440. Thus, Hamad knew that the Department of Revenue's inspection of his store did not constitute discretionary acts by a government official but were conducted pursuant to a statute. *See Burger*, 482 U.S. at 711. In addition, the statute limits the "time, place, and scope" of the inspection to "regular business hours" at "any place where cigarette inventory is possessed, stored, or sold" and the inspectors may examine only the books, records, and cigarette inventory of the retail merchant. §§ 74-435, 74-440.

Here, the Department of Revenue agents searched H & Y with the purpose of inspecting the store's cigarette inventory pursuant to § 74-435 of the Ordinance. Further, the inspection occurred not only pursuant to the Ordinance, but after the Department of Revenue agents learned that H & Y was selling cigarettes that lacked the required county tax stamp – a violation of the Ordinance. *See* § 74-435(c) ("the sale, resale or possession by a … retail tobacco dealer of … unstamped cigarettes … shall give rise to the prima facie presumption that the … retail tobacco dealer … is in violation of the provisions of this article"). Thus, the Court finds that Agent Srain and Agent Glasper did not need a search warrant to conduct the search of H & Y on October 15, 2010.

## II. Seizure of the Handgun

Law enforcement officers may seize an item without a warrant if they have probable cause to believe that the item is linked to criminal activity. *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997). An item need not be inherently incriminating to establish probable cause.

*Id.* ("None of these items were inherently incriminating, but in connection with the crime being investigated, each item took on a suspicious nature, giving the officers probable cause to seize it") (citing *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994); *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994); and *United States v. Walton*, 814 F.2d 376, 380 (7th Cir. 1987)).

During their search of the cigarette inventory at H & Y, the Department of Revenue agents discovered approximately 1500 Hydrocodone pills, a .38 caliber handgun, and two magazines containing ammunition for a 9 mm handgun. All of these items were located in the area behind the counter at the store. When CPD Officer Gallegos arrived at H &Y, the Department of Revenue agents directed him to the location of the firearm and ammunition, the Hydrocodone pills, and the prescription pill bottles. In addition, Price told Officer Gallegos that she sold the pills individually for $5 apiece. Based on the facts and information he learned at the store, Officer Gallegos possessed probable cause to believe that Price was involved in the possession and distribution of a controlled substance.

Guns found in close proximity to drug activity are presumptively connected to that activity. *United States v. Corral*, 324 F.3d 866, 873 (7th Cir. 2003) (citing *United States v. Adams*, 125 F.3d 586, 597 (7th Cir. 1997)); *see also United States v. Brown*, 724 F.3d 801, 802 (7th Cir. 2013) (affirming conviction under 18 U.S.C. § 924(c)(1)(A) and finding that a handgun in a secret compartment in a car was "obviously … stored in the compartment to facilitate the defendant's drug dealing" even where the compartment was "at some distance" from the defendant and could be opened only by following a sequence of steps that would take approximately 30 seconds to complete). Indeed, two of the factors used to determine whether the possession of a gun is "in furtherance of" a drug trafficking crime under § 924(c)(1)(A) are

the accessibility of the gun and the proximity of the gun to the drugs. *United States v. Huddleston*, 593 F.3d 596, 602 (7th Cir. 2010) (citing *United States v. Ceballos-Torres*, 218 F.3d 409, 414-15 (5th Cir.), *modified on denial of rehearing*, 226 F.3d 651 (5th Cir. 2000)).

Here, the handgun was accessible to Price and was located in the same area of the store as, and in close proximity to, the prescription pills. Officer Gallegos, therefore, had probable cause to believe that the handgun was linked to criminal activity and his seizure of the handgun and ammunition was reasonable.

## III. Arrest of Hamad

While at H & Y, Officer Gallegos also learned from Price that she sold the pills for $5 dollars apiece and that the gun and the pills belonged to Hamad. Price stated that Hamad told her to sell the pills for $5 dollars each and allowed her to use the handgun for protection. When Hamad arrived at the 11th district police station, he identified himself to Officer Gallegos as the owner of H & Y and acknowledged that he was the owner of the handgun.[3]

Thus, at the time he arrested Hamad, Officer Gallegos was aware of facts that indicated that Hamad owned a small grocery store engaged in the possession and sale of a controlled substance, that Hamad oversaw the possession and sale of the controlled substance, and that Hamad owned a handgun which Officer Gallegos could reasonably believe was used in connection with the sale of the controlled substance. Based on the totality of these facts and circumstances, a reasonable, prudent person would believe that Hamad had committed a crime. *Abbott*, 705 F.3d at 714. Hamad's arrest, therefore, was lawful.

---

[3] The Court has already denied Hamad's previous motion to suppress his statement to Officer Gallegos that he owned the gun found at H & Y. (R. 45.)

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion to quash and suppress.

Date**:** December 20, 2013                    **ENTERED**

_____
**AMY J. ST. EVE
United States District Court Judge**